**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

Thomas L. Altimas and Lise Girard, John Burton
and Joanne Burton, William P. Conlen and Sharon
K. Gates, Samuel H. Kingsbury and Marcia P. Cox,
Shayne King and Erin Lydon-King, John
Koprowski and Danielle Koprowski, Garry Kuhn,
Sherrill A. Lane, Nancy Miller, William G. Smith
and Judith Smith, Orris A. Rodahl, Fue R. Vang
and Chonnie Vang, Jason Wavra and Michele
Wavra, John Wavra, deceased, and Gale Wavra,
Paul and Kara Wuenstel, Kirk Whitehurst and
Dorothy Stenstrom-Mozelle,

                 Plaintiffs,               CASE NO.:

vs.

Russell Whitney, individually, Michael O. Kane,
individually, Kane Properties, Inc., a Florida
corporation d/b/a Gulfstream Development & Kane
Realty, Whitney Education Group, Inc., Whitney
Information Network, Inc., a Colorado corporation,
Wealth Intelligence Academy, Inc., a Florida
corporation, Gulfstream Development Group, LLC,
a Florida limited liability corporation, CCFL1234,
LLC f/k/a Gulfstream Realty & Development, LLC,
a Florida limited liability corporation, United
Mortgage Corporation, a Florida corporation, Kevin
Caraotta, individually, Douglas Realty, Inc., a
Florida corporation, Brian Haag, individually,
Kevin Haag, individually, Douglas Haag,
individually, Paradise Title Services, Inc., a Florida
corporation, Real Pro, LLC, a Florida limited
liability corporation, David A. Wittig, individually,
Hot Appraisals, LLC, a Florida limited liability
company, Ashley Seibert, individually, The
Construction Loan Company, Inc., a Michigan
corporation, National Credit Union Administration
Board as liquidator of Huron River Area Credit
Union, WKH Enterprises, LLC, a Florida limited
liability company, North Port Lot Partners, LLC, a

Florida limited liability company, Daniel Kelly, individually, and OHK, LLC, a Florida limited liability company,

                Defendants.

_____/

## **COMPLAINT**

Plaintiffs Thomas L. Altimas and Lise Girard, John Burton and Joanne Burton, William P. Conlen and Sharon K. Gates, Samuel H. Kingsbury and Marcia P. Cox, Shayne King and Erin Lydon-King, John Koprowski and Danielle Koprowski, Garry Kuhn, Sherrill A. Lane, Nancy Miller, William G. Smith and Judith Smith, Orris A. Rodahl, Fue R. Vang and Chonnie Vang, Jason Wavra and Michele Wavra, John Wavra, deceased, and Gale Wavra, Paul and Kara Wuenstel, Kirk Whitehurst and Dorothy Stenstrom-Mozelle, ("Plaintiffs"), sue the Defendants, Russell Whitney, Michael O. Kane, Kane Properties, Inc., a Florida corporation d/b/a Gulfstream Development & Kane Realty, Whitney Education Group, Inc., Whitney Information Network, Inc., Wealth Intelligence Academy, Inc., Gulfstream Development Group, LLC, CCFL1234, LLC f/k/a Gulfstream Realty & Development, LLC,  United Mortgage Corporation, Kevin Caraotta, Douglas Realty, Inc., Brian Haag, Kevin Haag, Douglas Haag, Paradise Title Services, Inc., Real Pro, LLC, David A. Wittig, Hot Appraisals, LLC, Ashley Seibert, The Construction Loan Company, Inc., National Credit Union Administration Board as liquidator of Huron River Area Credit Union, WKH Enterprises, LLC, North Port Lot Partners, LLC, Daniel Kelly, individually, and OHK, LLC.

1.      This is an action for damages exceeding $75,000.00 in amount, exclusive of interest and costs.   This Court has jurisdiction over this action pursuant to 28 U.S.C. 1331, 18 U.S.C. 1964 and 12 U.S.C. 1789(a)(2) because it involves claims arising under 18 U.S.C. 1962 and the National Credit Union Administration Board is a party to the case.   This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. 1367.   Venue is proper in this Court pursuant to 18 U.S.C. 1391(b) in that a substantial part of the events and activities giving rise to the claims alleged herein occurred in this Judicial District and Defendants reside and may be found in this Judicial District.

2.      This action involves title to real property located in the State of Florida.

3.      The Plaintiffs Thomas L. Altimas and Lise Girard are husband and wife and reside in Maryland.

4.      The Plaintiffs John Burton and Joanne Burton are husband and wife and reside in California.

5.      The Plaintiff William P. Conlen is an individual residing with Plaintiff Sharon K. Gates in the State of Michigan.

6.      The Plaintiffs Samuel H. Kingsbury and Marcia P. Cox are husband and wife and reside in the State of Florida.

7.      The Plaintiffs Shayne King and Erin Lydon-King are husband and wife and reside in the Commonwealth of Massachusetts.

8.      The Plaintiffs John Koprowski and Danielle Koprowski are husband and wife and reside in the State of Illinois.

9.      The Plaintiff Garry Kuhn is an individual residing in the State of Illinois.

10.     The Plaintiff Sherrill A. Lane is an individual residing in the State of California.

11.     The Plaintiff Nancy Miller is an individual residing in the State of Tennessee.

12.     The Plaintiffs William G. Smith and Judith Smith are husband and wife and reside in the State of California.

13.     The Plaintiff Orris A. Rodahl is an individual residing in the State of Minnesota.

14.     The Plaintiffs Fue R. Vang and Chonnie Vang are husband and wife and reside in the State of California.

15.     The Plaintiffs Jason Wavra and Michele Wavra are husband and wife and reside in the State of California.

16.     Plaintiff Gale Wavra is the widow of decedent John Wavra and resides in the State of California.  John Wavra died on September 5, 2008.

17.     The Plaintiffs Paul and Kara Wuenstel are husband and wife and reside in the State of Texas.

18.     The Plaintiffs Kirk Whitehurst and Dorothy Stenstrom-Mozelle are husband and wife and reside in the State of Texas.

19.     The Defendant Russell Whitney ("Whitney") is an individual residing in Lee County, Florida.  Russell Whitney is or at all times material was the president and chairman of the board of Whitney Education Group, Inc. and the chairman of the board and chief executive officer of Whitney Information Network, Inc.  Upon information and belief,

Whitney is or at all times material was a 25% owner of Defendant Gulfstream Development Group, LLC.  Whitney is the president of Wealth Intelligence Academy, Inc.

20.     The Defendant Michael O. Kane is an individual residing in Florida.  Upon information and belief, Michael O. Kane is president, secretary and treasurer of Defendant Kane Properties, Inc., which owns and does business in Florida as Gulfstream Development & Kane Realty.  Upon information and belief, Michael O. Kane also holds a real estate sales associate license through Kane Properties, Inc.  Upon information and belief, Michael O. Kane is or was at all times material hereto the managing member of Defendant North Port Lot Partners, LLC.

21.     The Defendant Kane Properties, Inc. ("Kane Properties") is a Florida corporation.  Kane Properties owns and does business as Gulfstream Development & Kane Realty, a Florida fictitious name.

22.     The Defendant Whitney Education Group, Inc. ("Whitney Education") is a Florida corporation doing business in Florida.  Whitney Education conducts real estate seminars throughout the United States, including Florida, under the name "Millionaire University" ("MU").  Whitney Education is a wholly owned subsidiary of Whitney Information Network.

23.     The Defendant Whitney Information Network, Inc. ("Whitney Information Network") is a Colorado corporation doing business throughout the United States, including Florida.  Whitney Information Network, together with Whitney Education and Wealth Intelligence Academy, Inc., provides instructors, workshops, mentoring, and branded curricula at the MU real estate seminars that the Plaintiffs attended.

24.     The Defendant Wealth Intelligence Academy, Inc. is a Florida corporation doing business throughout the United States, including Florida.   Wealth Intelligence Academy, Inc. together with Whitney Information Network and Whitney Education, provided instructors, workshops, seminars, materials, mentoring and branded curricula at the MU real estate seminars the Plaintiffs attended.

25.     The Defendant Gulfstream Development Group, LLC ("Gulfstream") is a Florida limited liability company doing business in Florida.  Its Managing Member is Brian Haag.  Daniel Kelly is also a director and/or member of Gulfstream.  Upon information and belief Whitney owns or at all times material did own 25% of Gulfstream.  Upon information and belief, Gulfstream is currently doing business as "Blue Oak" outside of Florida.

26.     The Defendant Gulfstream Realty & Development, LLC ("Gulfstream Realty") is a Florida limited liability company doing business in Florida.  Gulfstream Realty changed its name to CCFL1234, LLC on December 28, 2006.   Its managing member is Kevin Haag.

27.     The Defendant United Mortgage Corporation ("United Mortgage") is a Florida corporation which at all times material was conducting business in Florida.  At all material times United Mortgage acted as agent to obtain mortgages and loans for Construction Loan Company and Huron River Area Credit Union, and acted within the scope of its agency.

28.     The Defendant Kevin Caraotta is the President of United Mortgage and a resident of the State of Florida.  Under the direction and instruction of Kevin Caraotta, Caraotta and United Mortgage agents and employees drafted the residential loan applications

for the MU Properties, including but not limited to, supplying the grossly fraudulent "Present Market Value" monetary figure for the Plaintiffs' investment properties.  Caraotta was often an instructor at the Millionaire University ("MU") courses.

29.     The Defendant Douglas Realty, Inc. ("Douglas Realty") is a Florida corporation doing business in Florida.  Its president is Kevin Haag and its vice president is Douglas Haag. Both are directors of Douglas Realty.

30.     The Defendant Kevin Haag is an individual residing or at all times material was residing in Florida.

31.     The Defendant Brian Haag is an individual residing or at all times material was residing in Florida.

32.     The Defendant Douglas Haag is an individual residing or at all times material was residing in Florida.

33.     The Defendant Paradise Title Services, Inc. ("Paradise") is a Florida corporation doing business in Florida.

34.     The Defendant Real Pro, LLC ("Real Pro" or "Appraiser") is a Florida limited liability corporation doing business in Florida.  Upon information and belief, Real Pro generated the grossly fraudulent appraisal reports on many of the investment properties of the Plaintiffs.

35.     The Defendant David A. Wittig ("Wittig" or "Appraiser") is an individual residing in Florida.  Wittig is an appraiser with Real Pro who grossly and intentionally inflated and misrepresented the values of many of the investment properties of the Plaintiffs at the direction of the MU Partners.

36.     The Defendant Hot Appraisals, LLC ("Hot Appraisals" or "Appraiser") is a Florida limited liability corporation doing business in Florida.  Upon information and belief, Hot Appraisals generated the grossly fraudulent appraisal reports on many of the investment properties of the Plaintiffs.

37.     The Defendant Ashley L. Seibert ("Seibert" or "Appraiser") is an individual residing in Florida.  Seibert is an appraiser with Hot Appraisals who grossly and intentionally inflated and misrepresented the values of many of the investment properties of the Plaintiffs at the direction of the MU Partners.

38.     The Defendant Daniel Kelly is an individual who at all times material resided in the State of Florida.  Kelly at all times material hereto was a director and/or owner with Defendant Brian Haag and Defendant Whitney in Defendant Gulfstream.  Kelly is or at all times material hereto was also a one third owner in Defendant WKH Enterprises, LLC, and serves or has served at all times material as WKH Enterprises, LLC's managing member.

39.     The Defendant WKH Enterprises, LLC is a Florida limited liability company doing business in Florida.  Defendant Brian Haag is or at all times material hereto was a one third owner of WKH Enterprises, LLC.  Defendant Daniel Kelly is also a one third owner of WKH Enterprises, LLC.   WKH Enterprises owned many of the MU Properties and transferred the lots to North Port Lot Partners, LLC just before North Port Lot Partners, LLC sold the lots to many of the Plaintiffs at substantial profits.

40.     The Defendant North Port Lot Partners, LLC is a Florida limited liability company doing business in Florida.  Michael O. Kane is the managing member of North Port Lot Partners, LLC.  North Port Lot Partners, LLC was formed in April of 2006 and is the

seller of many of the MU Properties to the Plaintiffs.  In most of the transactions involving North Port Lot Partners, LLC, Defendant WKH Enterprises, LLC or a third party seller transferred ownership in the property to North Port Lot Partners, LLC just before North Port Lot Partners, LLC sold the property to the Plaintiffs.

41.     The Defendant OHK, LLC ("OHK") is a Florida limited liability company doing business in Florida.  OHK's managing member is Michael O. Kane and OHK owned one or more of the MU Properties sold to the Plaintiffs at inflated prices by Kane Properties, Inc. and Michael O. Kane.

42.     The Defendants Whitney, Michael O. Kane, Kane Properties, Inc., Whitney Education, Whitney Information Network, Wealth Intelligence Academy, Inc., Gulfstream, Gulfstream Realty, United Mortgage, Douglas Realty, Paradise, Brian Haag, Kevin Haag, Douglas Haag, Kevin Caraotta, Wittig, Seibert, Real Pro, Hot Appraisals, Daniel Kelly, WKH Enterprises, LLC, North Port Lot Partners, LLC, and OHK, LLC,  ("the MU Partners") are partners or joint venturers in an enterprise to sell, develop, finance, market and manage Florida real estate to and for Millionaire University students (the "MU Partnership" or "MU Enterprise").  Whitney, Whitney Education, Whitney Information Network, and the Wealth Intelligence Academy, Inc. acted as the marketing arm of the MU Partnership enticing prospective purchasers of property to their offices in Cape Coral, Florida and other seminar locations, where the MU Program, described below, was presented to the prospects by the MU Partners.

43.     The Defendant The Construction Loan Company, Inc. ("CLC") is a Michigan corporation who at all times material was doing business in Florida.   CLC provided

construction loans to MU students pursuant to business arrangements created by United Mortgage on CLC and Huron River Area Credit Union's behalf to facilitate the fraudulent transactions. Immediately after the construction loan was closed with CLC designated as the lender, CLC immediately attempted to assign each construction loan to Huron River Area Credit Union for a profit to CLC. As alleged below, these immediate assignments from CLC to Huron River Area Credit Union are illegal and void because the Plaintiffs were not legal members of Huron River Area Credit Union. Additionally, CLC knowingly and intentionally drafted loan documents that falsely identified the MU Properties as the Plaintiffs' primary and/or principal residences despite the knowledge and loan documentation that the properties were in fact investment properties. The investment nature of these properties was noted on the loan applications, approval forms and throughout the loan documents of CLC, Huron and UMC. CLC and Huron drafted the documents in such a manner in order to mischaracterize the true nature of the loans and to avoid statutory and regulatory limits on business loans applicable to Huron River Area Credit Union.

   44.   The Defendant Huron River Area Credit Union ("Huron") was at all times material a state-chartered federally insured Michigan credit union conducting business in the State of Florida. The National Credit Union Administration Board assumed control of Huron in or about February of 2007 and ultimately liquidated Huron in November of 2007. At all times material, CLC acted as Huron's agent for Huron's Florida construction loan program. Huron gave CLC total control of its construction loan program, provided CLC with multi-million dollar lines of credit, and partnered with CLC to provide illegal funding for the MU investment properties. The NCUA, after conducting an investigation to answer the question

of why Huron failed, has admitted that the loans and funding for the loans on the investment properties were illegal in its Material Loss Review report on Huron, published in November of 2008.  A true and correct copy of the NCUA's Material Loss Report is attached hereto as Exhibit A.  United Mortgage and CLC acted as agents for Huron in obtaining construction loans and mortgages at exorbitant interest rates, costs, and terms for the Plaintiffs' investment properties.  CLC, Huron and United Mortgage, as well as the MU Partners, knew the appraisals upon which the construction loans were based, as well as the present market value representations in the loan applications made by UMC, were fraudulent, grossly exaggerated, and violative of lending laws and regulations.

45.    Hereinafter the MU Partners, CLC, and Huron are referred to as the "Defendants."  At all relevant times, each of the Defendants acted as agent for each of the other Defendants so that each of the Defendants could obtain money from and through the MU students.

**THE FRAUDULENT SCHEME**

46.    The MU Partners participated in a scheme to defraud people of their money through the sale of real estate in Southwest Florida at inflated prices with excessive fees and commissions paid to the various defendants as part of the fraudulent transactions.  The MU Partners entice people to invest in real estate through real estate educational courses in which the Defendants intentionally build a relationship of trust with the "students" to whom they then pitch their real estate investment "opportunities."   The real estate courses, which generally cost in excess of $20,000.00, facilitate the MU Partners' fraud by attracting people from throughout the United States who are highly motivated to invest in real estate, lack

experience and know-how in real estate investment and have sufficient funds and financial credit to invest. During the MU Partners' real estate courses, the students, who are the targets of the fraud, are "taught" how to identify good real estate investments and then are presented with the MU Partners' investment "opportunity," which the MU Partners' representatives/instructors and agents represent matches what the MU students were taught they should buy. Some of the instructors and mentors who teach and guide the students are employed by or have an ownership interest in the MU Partners' corporations who participate in the selling and financing of the investment.

47. Pursuant to the scheme to defraud, the Defendants Whitney Education, Whitney Information Network, Wealth Intelligence Academy, Inc. and Russ Whitney advertise the educational courses using infomercials, mailers, and other advertisements. Infomercials are broadcast on television stations throughout the United States, promoting the sale of real estate investment courses. During a typical infomercial, Whitney tells how he made millions in real estate and uses testimonials from others who explain how they made money in real estate using information learned from attending one of the Whitney educational courses. The infomercial then typically gives information about how the viewer can attend a free one day seminar offered in that television viewing area to learn how to make money in real estate. Similarly, Defendants Whitney Education, Whitney Information Network, and Wealth Intelligence Academy also present at wealth forums throughout the United States and invite attendees at such forums to a one day seminar.

48. During the one day seminar Whitney Education, Whitney Information Network, and the Wealth Intelligence Academy, Inc. provide some instruction regarding real

estate investing.  The Whitney instructors for the seminar manipulate the teacher/student relationship to build a relationship of trust with the seminar attendees.  The instructors tell their students that the real estate instruction given during the one day seminar only scratches the surface of the subject and that to really succeed in real estate investment the student should increase their credit card limits according to a provided script/instructions and then purchase and enroll in other expensive real estate courses offered by Whitney Education, Wealth Intelligence Academy, and Whitney Information Network.  These additional educational courses typically include an "advanced" real estate course offered in the viewer's home state that can cost as much as $1,500.  They also try to sell additional advanced real estate courses offered in various cities throughout the United States.  Each "advanced" course is typically three days and can cost over $10,000.00 without advance purchase discounts. The attendees are typically advised by their instructors to purchase expensive educational packages with representations of high real estate investing success percentages for purchases of educational packages over $25,000.

49.    Whitney Education, Whitney Information Network, and the Wealth Intelligence Academy, Inc. also typically inform students that a prerequisite to attending all other advanced courses is attendance at the Intensified Real Estate Training Course offered in the offices of Whitney Education in Cape Coral, Florida, or other locations, also known as "Millionaire University."  Students are commonly advised that their first advanced course should be this "Millionaire University" course.  During the three-day "intensified" course, the "students" are "taught" about real estate investing from so-called real estate "millionaire" experts, such as Larry Schooler, who cultivate and establish a relationship of trust with the

students.  The MU Partners' goal is to convince the MU students that Whitney Education, Whitney Information Network, the Wealth Intelligence Academy, Inc. and the representatives of the Defendants who teach the students who attend Millionaire University ("MU") are successful real estate investing experts with whom the students should place their trust and reliance in making real estate investment decisions.

50.     At MU, the MU Partners' representatives teach the MU students that to succeed in real estate they must have a "Power Team," typically consisting of a lender, real estate broker, contractor, title company, property manager and perhaps other real estate professionals, depending upon the nature of the real estate investment.  At MU, students are commonly introduced to Gulfstream (contractor), United Mortgage (lender), Douglas Realty (real estate broker and property manager), and Paradise (title company), representatives of which sometimes "teach" the students about their areas of expertise in the real estate business.

51.     Near the end of the three day course the MU students are typically taken on a bus tour through Cape Coral or other locations where the Millionaire University course is being held and shown potential real estate investments by MU instructors employed by one or more of the MU Partners and acting on behalf of each of the MU Partners.  The trip usually begins with a viewing of distressed homes in low income areas that might be purchased as a "fixer-upper."  After seeing small homes in disrepair in poorer neighborhoods, the MU students are then typically taken to a middle income, well-maintained neighborhood and shown a newly constructed, model home built by Gulfstream. The contrast between the fixer upper or rehab properties and the new construction home

model makes the Gulfstream home appear to be a very attractive investment.  Alternatively, the newly constructed, model home built by Gulfstream is shown photographically by the MU instructors to the students who attend MU in locations other than Cape Coral, Florida.

52.     Representatives of the MU Partners, such as Brad Williams, Kevin Caraotta and Kevin Haag, tell the MU students that "Russ" and the MU Partners have set up a "turnkey" investment program exclusively for the MU students which is so lucrative that it will pay back every dollar spent by the student for the intensified real estate training at MU and give them capital to jumpstart their real estate investing careers.  They describe this "exclusive" turnkey investment as one or more Gulfstream homes similar to the one shown on the tour or in the photos, which will be built on "prime" and "premium" lots selected by Douglas Realty or other MU Partners in comparable neighborhoods.  They represent to the MU students that this investment opportunity meets all of the conditions for making money in real estate with little risk, almost no money down, and that the MU Partners are making this exclusive investment opportunity available only for a limited time, so that the students need to invest quickly in order to reserve a spot in the investment program.  This exclusive investment program, (the "MU-Program"), most typically includes a home built by Gulfstream, financed by or through United Mortgage through CLC and then Huron, on a "prime" and "premium" lot expertly located by Douglas Realty or other MU Partners, titled through the expertise of Paradise Title, sold at a price represented to be $55,000 to $100,000 below the "current appraised value" or "present market value" of the property, and managed and marketed through the expert property management and real estate brokering services of Douglas Realty and Gulfstream Realty.  MU students are asked to rely upon the expertise of

MU, its faculty and partners, to (a) select a "prime" lot in a neighborhood comparable to the one shown during MU, (b) select and obtain the best, most appropriate financing, (c) build a well constructed home that meets the specifications furnished by the MU Partners to the MU students and would be in demand in the market, and (d) market the property for sale and/or rent by Gulfstream Realty at or above the appraised values and rental values represented to the MU students.  The MU Partners also represent that they will not overbuild MU Program homes in a neighborhood so that MU students who purchase the turnkey properties will not have to compete with other MU students to resell their investment property.

53.     The MU Partners pressure the MU students to make a quick decision to invest, representing that there are only a limited number of spots in the investment program available and that numerous former MU students are seeking to invest in the program.  They also pressure the MU students to decide quickly by offering discounts to the students if they make a quick commitment.  To participate in the MU Program, the MU students are required to put very little of their own money down initially, which meets one of the criteria for a prudent real estate investment as instructed in the MU real estate courses.  Pursuant to the MU Program, the cost of the lot and the construction is financed through a one year construction loan with a lender chosen by the MU Partners.  For all of the Plaintiffs, the initial construction loan lender was The Construction Loan Company.  The MU Partners also represent that the loan will be modified and refinanced after construction is completed through permanent financing available through United Mortgage.  All of the construction loan financing is selected and obtained by the MU Partners for the MU students.  The representatives of the MU Partners represent that Gulfstream pays a substantial portion of the

interest on the construction loan.  They further represent to the MU students that while the construction is proceeding, Douglas Realty and Gulfstream Realty will use their expertise and "excellent" reputation in the Southwest Florida real estate market to sell the home at a substantial profit before the MU student is required to obtain permanent financing to pay off the construction loan.  To further induce the MU student to invest, the MU Partners further represent that, in the event the MU student chooses to hold the property, Gulfstream Realty will lease and manage the MU Property at lease rates that will pay for all but a small portion of the monthly payments for mortgage, taxes and insurance.  The MU Partners further represent to the MU students that the MU Partners will not over-build these homes in an area, thereby avoiding competition among MU students with each other to resell their homes.  The students are further counseled by their MU instructors and mentors, who work for and on behalf of the MU Partners, that since they are purchasing these homes at a price so far below their "current appraised value," they should consider buying at least two of them if they can qualify for the financing.

54.    Upon a MU student's commitment to purchase one or more MU Program homes, the MU Partners provide or mail a package of documents to the student to sign in blank, including contracts to buy a lot or be assigned a contract to purchase a lot by one of the MU Partners, to pay Gulfstream to build the home, and to hire Douglas Realty and/or Gulfstream Realty as the exclusive realtor and property manager for the property.  The MU Partners instruct the students to immediately return the documents signed in blank to them. The MU Partners later fill out the contract to buy the lot with a legal description, street address, price, directions for the payment of commissions to various MU Partners, and an

obligation to purchase without any condition for financing.  Likewise, the construction contract with Gulfstream is later filled out by the MU Partners with the lot address and legal description, a construction price and an obligation to pay for the construction without any contingency for financing.  The MU Partners also direct the MU students to sign a mortgage brokerage contract with United Mortgage, which contains the fraudulent appraisal price for the property to be financed, designated as the "appraised fair market value" of the investment property.  After the student has signed documents purporting to create an obligation to buy a lot and pay to build the investment home, United Mortgage, acting for itself and as agent for CLC and Huron River Area Credit Union, selects and arranges financing with CLC through which the MU student will typically purchase or acquire the lot from Kane Properties, Inc., doing business as Gulfstream Development and Kane Realty, and construct the investment home.  United Mortgage represents to the MU students that this is the best financing available for persons like the MU students with credit ratings at or above 700.  United Mortgage then provides the MU students with loan documents, prepared by United Mortgage, which contain a fraudulent appraisal price or present market value for the home with the lot.  The MU Partners set the appraisal price by first determining how much money the Defendants would make through the sale of the lot, the construction of the house and the financing of the purchase, including excessive fees.  This calculation in turn determines the amount of the note and mortgage for the one year construction loan, which represents the purchase price charged to the MU student.  After the MU Partners know that amount, they then arrange for an appraisal by Real Pro/Wittig or Hot Appraisals/Seibert which would value the property high enough so that the construction loan amount would be 80% of the

appraised value.  The MU Partners' fraudulent appraisal value is important to the fraudulent scheme because it facilitates the transaction: the financing by CLC and Huron who knowingly utilize the fraudulent appraisal in providing the construction financing, the payment for the overpriced lot which typically has been bought and sold among one or more of the MU partners to artificially increase the price charged to the MU student investor, the excessive price for the construction of the home and the excessive fees and charges paid upon closing to the Defendants.

55.     United Mortgage and CLC then direct the MU students financing with United Mortgage, CLC, and Huron to sign mortgage documents, prepared, selected and approved by United Mortgage, CLC, and Huron which represent that the home under construction would be the borrowers' "primary" or "principal" residence, even though United Mortgage, CLC, and Huron knew, and such loan documents as the application, servicing worksheets, and Huron Approval Form clearly note that the home is an investment property.  When United Mortgage and/or CLC were questioned about this, they advised the MU students to disregard the primary residence language and that the lender had taken care of that issue for them**.** Upon information and belief, United Mortgage, CLC and/or Huron misrepresented the occupancy in the mortgage documents in an attempt to avoid federal statutes and federal regulations limiting the amount of business loans or funding that Huron River Area Credit Union could make or acquire.  Additionally, the Defendants may also have documented the financing in this manner in an attempt to obtain a lower rate of interest, which reduced the interest payments made by Gulfstream and helped to insure that the students would qualify for the loans.

56.     The Plaintiffs are former MU students targeted by the Defendants and to whom the Defendants' representatives made the above described representations.   The Plaintiffs enrolled in and attended the above described real estate courses, participated in the MU Program and trusted their instructors and the MU Partners to act in their best interests throughout each phase of the MU Program, including the selection of the lot and financing, the setting of the purchase price and the construction, marketing and management of the investment property.   The Plaintiffs invested their money in the "MU-Program," buying one or more properties from and through the Defendants with financing provided by or through CLC and Huron.   The Defendants' representatives selected the lots and the financing for each of the Plaintiffs.   The lots and homes purchased by the Plaintiffs through the MU Program are referred to as the "MU Properties."   A list of the street addresses and legal descriptions of the MU Properties is attached as Exhibit B to this Complaint.

57.     As described more fully below, the "current appraised value" and present market values of the properties represented to the Plaintiffs were grossly and fraudulently overstated by the MU Partners when they induced the Plaintiffs to invest in the MU Program and by CLC and Huron who provided financing for the MU Properties.   Furthermore, the Defendants did not have "prime" or "premium" lots available and did not obtain "prime" or "premium" lots for construction of these homes.   Instead, the MU Partners purchased undesirable lots, commonly in remote locations, with poor roads and without curbs, sidewalks or street lighting, in some high crime, highly vandalized areas, with only well water and septic tanks available, and then marked up the lot prices thousands to tens of thousands of dollars and resold them to the MU students/Plaintiffs for substantial profit that

was undisclosed to the Plaintiffs.  Moreover, the MU Program homes were in fact over built, so that in some instances, five or more of the same model home are in close proximity to one another, all of which were built and listed for sale at or about the same time.  The Defendants also did not limit participation the MU Program to only MU students, creating even more competition for purchasers of the investment homes.  The result of such overbuilding is a glut of MU homes on the market, in undesirable locations, offered at prices for as much as $100,000+ over their true appraisal values.  These MU homes cannot be sold, except at a crippling loss to their owners, and cannot be rented for a reasonable rental amount.

58.    The financing selected for the Plaintiffs by United Mortgage and the other Defendants is based upon inflated, fraudulent appraisal values of the MU Properties by Real Pro, Wittig, Hot Appraisals, and/or Seibert.  CLC and Huron knowingly accepted and utilized the fraudulent appraisal values and reports in extending financing for the construction financing of the properties and thereby violated internal, industry and federal rules, regulations and mandatory guidelines.  Upon information and belief, regulations dictate that Huron obtain independent appraisals from an appraiser who is not affiliated with the builder.  Here, Real Pro/Wittig and Hot Appraisals/Seibert are affiliated with Gulfstream, United Mortgage and possibly other MU Partners, and were influenced by one or more of the MU Partners to grossly exaggerate the appraisal values for the investment properties.  The rate of interest charged on the construction loans is excessive in light of the Plaintiffs' high credit scores and the points paid by the Plaintiffs to United Mortgage to discount the loan rates.  The closing costs on the construction loans are far in excess of closing costs typically charged for loans such as those arranged for the Plaintiffs to purchase the MU Properties.

The splitting of the construction financing to one lender and the permanent financing to another lender without locking in financing for both the construction and permanent at the commencement of the construction is also contrary to industry customs and standards.

59.     The MU Partners, CLC and Huron have coerced or have attempted to coerce the Plaintiffs to close on permanent financing, in many cases falsely representing to the Plaintiffs that the MU Properties have a current appraised value in excess of the construction loan amounts.   Appraised values determined by independent appraisers acting either for potential third party lenders or the MU Students/Plaintiffs are substantially below the appraised values and present market values represented by the Defendants and below the construction loan amounts, so that the MU Properties cannot sufficiently collateralize refinancing to pay off the construction loans.

60.     The Plaintiffs have retained the undersigned counsel and agreed to pay them a reasonable fee for their services.

61.     All conditions precedent to this action have been waived, performed or have occurred.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**MU PARTNERS**

62.     The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61 above.

63.     At all material times the MU Partners owed a fiduciary duty to the Plaintiffs, to act in their best interests.

64.     United Mortgage acted as a mortgage broker in the transactions with the Plaintiffs and arranged all of the financing for the purchase and construction of the MU Properties.  United Mortgage was the lender for the "Power Team" in the MU Program, and was represented to the Plaintiffs as providing the investor with the best financing opportunities at the lowest rates.

65.     Douglas Realty acted as the Power Team member acting as the real estate broker on behalf of the Plaintiffs in connection with the selection and purchase of the allegedly premium or prime lots in excellent locations for building MU Program homes and with Gulfstream Realty, for the marketing and management of MU Properties.  Gulfstream Realty and Douglas Realty were also presented as the experts in choosing the locations and desirable model of home suitable for investment success.

66.     Paradise acted as the Power Team member acting as the title company on behalf of the Plaintiffs in connection with the closings of the MU Properties.

67.     One or both of the Appraisers acted as appraisers and established the "Current Appraised Value" and present market value figures which the MU Partners presented to the MU Students to induce the investments, and which value was utilized for the construction lending.

68.     The instructors teaching Millionaire University often taught the MU students that the instructors themselves were also part of the student's growing Power Team and that the students could place their trust in the instructors for real estate investing advice.

69.     The MU Partners breached their fiduciary duty by:

a.  misrepresenting the appraised value and present market value of the MU Properties;

b.  misrepresenting the rental rates available for the MU Properties;

c.  selecting undesirable lots and typically purchasing them directly or indirectly through a holding company or other related entity from one or more of the MU Partners and reselling them to the Plaintiffs at an overvalued price for a substantial profit to the MU Partners and one or more of the following defendants:  Brian Haag, Daniel Kelly, Michael O. Kane, Kane Properties, Inc., WKH Enterprises, North Port Lot Partners, and OHK, LLC;

d.  selecting lots for the Plaintiffs that were not in neighborhoods comparable to the neighborhood shown to the Plaintiffs during the real estate tour as part of the teaching in the MU course or presented during the MU course through photographs and slides;

e.  overbuilding the MU Properties to reduce the cost to the MU Partners of purchasing the lots and building the houses, without passing any of the cost savings on to the Plaintiffs, and then glutting the market with the same or similar floor plan homes;

f.  charging excessive real estate commissions, which were passed on to the Plaintiffs;

g.  fraudulently creating false loan documents which misstated the purpose for which the homes were being constructed;

h.   misrepresenting the meaning of the loan documents to the Plaintiffs;

i.   fraudulently creating false loan documents to finance the purchase of the MU Properties, which were based upon fraudulent and inflated appraisals of the Appraisers for CLC and Huron;

j.   charging excessive closing costs to the Plaintiffs;

k.   failing to obtain the best available financing at competitive loan rates available on the market to borrowers who, like the Plaintiffs, have high credit scores and instead funneling the Plaintiffs to CLC and Huron with onerous terms of financing;

l.   charging loan discount fees to the Plaintiffs for a discount on the loan interest rate and then failing to discount the interest rate; and

m.   other self serving acts and omissions to promote and protect the interests of the MU Partners at the expense of the Plaintiffs, which Plaintiffs expect to learn through discovery.

70.   As a direct and proximate result of the MU Partners breach of fiduciary duty the Plaintiffs have been damaged.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against the MU Partners for damages, interest, punitive damages, costs and all other and further relief which this court deems just.

### COUNT II
### BREACH OF FIDUCIARY DUTY
### CLC AND HURON

71.     The Plaintiffs reallege the allegations of paragraphs 1-61 and 63-69 above as if they were fully set forth herein.

72.     CLC directly, and Huron indirectly acted as mortgage lender on MU Properties for the Plaintiffs.

73.     CLC and Huron were at all material times aware of and a participant in the MU Program and allowed United Mortgage and the MU Partners to act on behalf of CLC and Huron to induce prospective real estate investors to obtain mortgage lending from CLC for construction loans for investment properties so that CLC could make a profit on each such construction loan and immediately attempt to illegally assign the loans to Huron.  Huron would then profit on said construction loan via the payment of interest from the builder and possibly the Plaintiffs at an above normal rate of interest.  Huron and/or its agents also have apparently tampered with and altered the Plaintiffs' membership applications, which Plaintiffs were instructed to make, in an intentional attempt to make the Plaintiffs members of Huron when Huron and CLC knew that the Plaintiffs did not meet eligibility requirements for membership in Huron.  Consequently, CLC and Huron owed a fiduciary duty to the Plaintiffs to act in their best interests, particularly where CLC and Huron were attempting to illegally transfer or assign the loans from CLC to Huron in breach of Michigan statutes, the rules and regulations of the Michigan credit union regulators and the National Credit Union Association Board, and federal law.

74.     CLC and Huron breached their fiduciary duties to the Plaintiffs by:

a.  making a construction loan to the Plaintiffs and purporting to obligate them to repay that loan, when CLC and Huron knew the loan was based upon a grossly inflated and fraudulent appraised value of the property by the Appraisers in violation of lending rules, regulations, and guidelines applicable to CLC and Huron, and otherwise intentionally failing to verify the true value of such property;

b.  drafting and directing the Plaintiffs to sign loan documents which represented that the MU Property which they were purchasing and constructing was their "primary" or principal residence when the Plaintiffs' loan applications and other loan documents, including CLC and Huron's loan approval documents and servicing sheet clearly showed that it was investment property, which acts were committed in a blatant attempt to avoid state and federal laws and regulations limiting the amount of business loans that Huron could legally make or acquire;

c.  charging the Plaintiffs a rate of interest on their construction loans that far exceeded the market rate for borrowers with credit scores as high as those of the Plaintiffs, and otherwise failing to discount the rate of interest after Plaintiffs paid for such a discount;

d.  actively participating in the fraudulent scheme of the MU Partners by making the construction lending as described above and attempting to illegally transfer the loans and mortgages originated in the name of CLC

with Huron's money to Huron despite the fact that the Plaintiffs were not members of Huron River Area Credit Union;

e.   intentionally establishing CLC as the initial lender although the funding for the loans was illegally provided by Huron and failing to disclose these illegal actions to the Plaintiffs;

f.   illegally and without authorization altering and changing the membership applications that CLC and Huron required the Plaintiffs to execute at the closing on the construction loan in an attempt to indicate that the Plaintiffs were attempting to join Huron through Learn & Earn Credit, LLC, an entity unknown to the Plaintiffs;

g.   immediately, typically on the same day as the closing, illegally attempting to assign the construction loan from CLC to Huron in a clear, obvious, and intentional attempt to avoid the rules, regulations, mandates and guidelines applicable to CLC and Huron; and

h.   failing to disclose to the CLC Plaintiffs the facts known and documented in CLC and Huron's files that United Mortgage, CLC and Huron were part of the fraudulent scheme, were conducting illegal transactions in violation of Michigan and federal laws, rules and regulations and that the appraisal reports were fraudulent.

75.   As a direct and proximate result of CLC and Huron's breach of fiduciary duty the Plaintiffs have been damaged.

**WHEREFORE,** the Plaintiffs demand judgment in their favor and against CLC and Huron for damages, punitive damages, interest, costs and all other and further relief which this court deems just.

## COUNT III
## CONSTRUCTIVE FRAUD
## MU PARTNERS

76.     The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61 and 63-70 above.

77.     The MU Partners abused their fiduciary relationship with the Plaintiffs through their acts as described above.  The MU Partners committed a constructive fraud against the Plaintiffs by abusing their fiduciary relationship with the Plaintiffs at the expense of the Plaintiffs, as more fully described above.

78.     As a direct and proximate result of the constructive fraud of the MU Partners, the Plaintiffs have been damaged.

**WHEREFORE**, the Plaintiffs demand judgment against the MU Partners for rescission of the contracts to purchase the MU Properties and the promissory notes and mortgages secured by the MU Properties and imposition of a constructive trust for the benefit of the Plaintiffs upon any money paid to the MU Partners pursuant to the contracts to purchase, notes or mortgage transactions and any proceeds or profits obtained from the use, lease, sale or any other beneficial use of the MU Properties by the MU Partners or their assigns, plus rescissionary damages, punitive damages, interest, costs and any other relief this Court deems to be just and equitable.

**COUNT IV**
**CONSTRUCTIVE FRAUD**
**CLC AND HURON**

79.     The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61 and 63-69, and 72-75 above.

80.     CLC and Huron abused their fiduciary relationship with the Plaintiffs through their acts as described above.  CLC and Huron committed a constructive fraud against the Plaintiffs by abusing their fiduciary relationship with the Plaintiffs and committing illegal acts at the expense of the Plaintiffs, as more fully described above.

81.     As a direct and proximate result of the constructive fraud of CLC and Huron, the Plaintiffs have been damaged.

82.     As a result of the constructive fraud of CLC, Huron and the MU Partners acting on behalf of CLC and Huron, CLC obtained mortgages and promissory notes secured by the MU Properties, which CLC illegally attempted to assign to Huron and which now the NCUA as liquidating agent of Huron is attempting to claim as assets of Huron.

83.     It would be unjust and against equity to allow CLC or the NCUA acting as liquidating agent for Huron to enforce the mortgages and promissory notes against the Plaintiffs, to obtain ownership of the real property securing those mortgages, and to exact money from the Plaintiffs based upon the mortgages and promissory notes.  To allow the NCUA as liquidating agent for Huron to enforce the illegally funded and illegally assigned mortgages and notes against the Plaintiffs would be enforcing an illegal contract, which the law does not allow, and would be against public policy.

**WHEREFORE**, the Plaintiffs demand judgment against CLC and Huron for rescission of the promissory notes and mortgages secured by the MU Properties and imposition of a constructive trust for the benefit of the Plaintiffs upon any money paid to CLC and Huron by the Plaintiffs pursuant to the note or mortgage transactions and any proceeds or profits obtained from the use, lease, sale or any other beneficial use of the MU Properties by CLC or its assigns, plus rescissionary damages, punitive damages, interest, costs, a finding that the attempted assignment from CLC to Huron is void as illegal, and any other relief this Court deems to be just and equitable.

**COUNT V**
**VIOLATION OF MORTGAGE BROKERAGE AND LENDING LAWS**
**UNITED MORTGAGE AND KEVIN CARAOTTA**

84.     The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61, 64, 67, 69 a., g., h., i., j., k., l., and m. above.

85.     United Mortgage is a mortgage broker within the meaning of Chapter 494 Florida Statutes.

86.     Kevin Caraotta, as the president of United Mortgage, is liable with United Mortgage for his participation in the fraudulent scheme described above.

87.     Kevin Caraotta completed or oversaw the completion of the loan applications and supervised and approved the preparation of the loan documents which contain the fraudulent appraisals and misrepresentations as to the present market value and current appraised value of the MU properties.

88.     United Mortgage and Kevin Caraotta, by their participation in the fraudulent scheme described above, have violated §494.0025(4) Florida Statutes.

89.     The mortgage transactions described above are secured by the MU Properties were made in violation of §494.0025(4) Florida Statutes.

90.     United Mortgage and Kevin Caraotta are jointly and severally liable to the Plaintiffs on the mortgage transactions conducted with those Plaintiffs to whom each entity provided financing, pursuant to §494.0019(1) Florida Statutes for the damages incurred by the Plaintiffs.

**WHEREFORE**, the Plaintiffs demand judgment against United Mortgage and Kevin Caraotta for damages, interest, costs and all other and further relief which this court deems just.

<u>**COUNT VI**</u>
<u>**VIOLATION OF MORTGAGE BROKERAGE AND LENDING LAWS**</u>
<u>**CLC AND HURON**</u>

91.     The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61, 64-69, 72-75, and 80-83 above.

92.     CLC and Huron are or were at all times material mortgage lenders within the meaning of Chapter 494 Florida Statutes.

93.     CLC and Huron, by their participation in the fraudulent scheme described above, and by their illegal acts have violated §494.0025(4) Florida Statutes.

94.     The mortgage transactions described above secured by the MU Properties were made in violation of §494.0025(4) Florida Statutes.

95.     CLC, Huron, United Mortgage and Kevin Caraotta are jointly and severally liable to the Plaintiffs pursuant to §494.0019(1) Florida Statutes for the damages incurred by the CLC Plaintiffs.

**WHEREFORE**, the Plaintiffs demand judgment against CLC and Huron for damages, interest, costs and all other and further relief which this court deems just.

## COUNT VII
## VIOLATION OF FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
## MU PARTNERS

96.     The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61, 63-70, and 77-78 above.

97.     The MU Partners have violated the Florida Unfair and Deceptive Trade Practices Act, § 501.201 et seq. Florida Statutes ("FDUPTA") by using deceptive practices to sell and finance the MU Properties as set forth more fully above.

98.     The MU Partners, and specifically Brian Haag, Daniel Kelly, Michael O. Kane, Kane Properties, Inc., WKH Enterprises, and North Port Lot Partners, LLC, have further violated FDUPTA by churning or otherwise transferring certain MU properties among one or more of them before selling the property to Plaintiffs Paul and Kara Wuenstel, John and Gale Wavra, Vangs, Smiths, Burton, Kings, Conlen and Gates, Altimas and Girard, Rodahl, and Koprowski, at an artificially inflated and gouging purchase price.  For example, despite the representations and assurances that the MU Program would include a prime or premium lot expertly selected by Douglas Realty and the other MU Partners, Kane Properties, Inc. acquired the lot for John and Gale Wavra's 6246 Dalewood Circle investment property on September 5, 2006 for $30,000 and sold it that same day to the Wavras for $40,000, all occurring after Douglas Realty faxed the lot contract to the Wavras for execution on July 12, 2006.  Another example is Kane Properties, Inc. purchase of the Smith MU property on September 18, 2006 for $40,000 and the next day selling it to the

Smiths for $60,000, while also taking a 6% commission on the sale to the Smiths. Yet another example is the Kings' investment property at 7254 Muncey Road in North Port, where the property was sold by WKH Enterprises, LLC, whose owners include Daniel Kelly (1/3) and Brian Haag (1/3), who are both principals or directors in Gulfstream, to North Port Lot Partners, whose managing member is Michael O. Kane, before the property was sold to the Kings just a few months later. All of these sales were at significant profit to the detriment of the Plaintiffs without disclosures of the relationships between the parties to the prior sales or disclosure of the gouging.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the MU Partners for (1) damages, attorney fees and costs as provided by § 501.2105 Florida Statutes; (2) temporary and permanent injunctive relief pursuant to § 501.211 Florida Statutes enjoining the MU Partners from enforcing or foreclosing upon any contracts, notes or mortgages between them and the Plaintiffs pertaining to the MU Properties and rescinding all such contracts, notes and mortgages; (3) a declaratory judgment declaring that the acts of the MU Partners as set forth above violate FDUPTA; and (4) such other and further relief as the court deems proper.

### COUNT VIII
### VIOLATION OF FLORIDA UNFAIR AND DECEPTIVE
### TRADE PRACTICES ACT
### UNITED MORTGAGE, CLC AND HURON

99.    The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61, 63-69, 72-75, 80-83, 87, and 92-94 above.

100.    CLC, United Mortgage, and Huron have violated the Florida Unfair and Deceptive Trade Practices Act, § 501.201 et seq. Florida Statutes ("FDUPTA") by using

deceptive and illegal practices to finance the purchase of the MU Properties as set forth more fully above.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against United Mortgage, CLC and Huron for (1) damages, attorney fees and costs as provided by § 501.2105 Florida Statutes; (2) temporary and permanent injunctive relief pursuant to § 501.211 Florida Statutes enjoining United Mortgage, CLC and the NCUA as liquidating agent for Huron from enforcing or foreclosing upon any contracts, notes or mortgages between them and the Plaintiffs pertaining to the MU Properties and rescinding all such contracts, notes and mortgages; (3) a declaratory judgment declaring that the acts of United Mortgage, CLC and Huron as set forth above violate FDUPTA and that the attempts by CLC to assign the notes and mortgages to Huron are illegal and void; and (4) such other and further relief as the court deems proper.

<u>**COUNT IX**</u>
<u>**FRAUD IN THE INDUCMENT**</u>
<u>**MU PARTNERS**</u>

101.    The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61, 63-70, 77-78, and 98 above.

102.    The MU Partners made representations of material fact to the Plaintiffs concerning the MU Program and MU Properties, including:

      a.   that the MU Properties had the appraised values and present market values that the MU Partners were representing to the Plaintiffs;

b.  that the Plaintiffs could reasonably expect the MU Properties to rent at the rates that the MU Partners were representing to the Plaintiffs upon completion of construction of the homes;

c.  that the MU Partners intended to purchase choice, prime and premium lots for the Plaintiffs in a comparable neighborhood to the neighborhood shown to the Plaintiffs during the MU bus tour or via photographs;

d.  that the MU Partners would not saturate the market and overbuild in neighborhoods thereby forcing MU students to compete with other MU students to resell their investment homes;

e.  that the MU Partners intended to obtain suitable financing at the best market rates available to finance the purchase of the MU Properties;

f.  that investment in the MU Program was exclusive and limited only to MU students;

g.  that the real estate market was booming and had not declined;

h.  that if wanted out of the deal at later date that the investor would be bought out; and

i.  that the MU Partners intended to look out for the best interests of the Plaintiffs.

103.  The representations of the MU Partners were false when they were made.

104.  The MU Partners made these representations to the Plaintiffs during the three day real estate course that the Plaintiffs attended in Cape Coral, Florida at the offices of the Whitney corporate entities, or otherwise before the Plaintiffs invested in the fraudulent MU

Program.  The MU Partners have the dates when the Plaintiffs attended the MU courses in their records.  The MU Partners also included the false representations about the appraised values and present market values on Investment Program handouts, Good Faith Estimates for construction financing and on applications for financing which United Mortgage prepared, all of which the MU Partners presented, mailed, faxed and overnighted to the Plaintiffs.

105.    The MU Partners did not intend to purchase choice, prime and premium lots in a comparable neighborhood as that presented at MU.  Instead, they intended to find cheap lots which the MU Partners or their agents could buy and resell to the Plaintiffs at a substantial profit regardless of the suitability of the lots for the Plaintiffs' investment purposes.

106.    The MU Partners did not intend to refrain from overbuilding in a neighborhood.  Instead, they intended to buy numerous lots close together to save on lot purchases and home building costs, which savings they intended to keep for themselves as additional profit on their transactions with the Plaintiffs.

107.    The MU Partners did not intend to obtain suitable financing at the best market rates available.  Instead, the MU Partners intended to overcharge the Plaintiffs on closing costs and interest to increase their profits on the financing at the Plaintiffs' expense.

108.    The MU Partners did not intend to limit purchase of homes and lots in the MU Program to only MU students and sold to persons who had never attended MU, thereby creating more competition for sales of the MU Properties.

109.    One or more of the MU Partners failed to disclose to the MU students of the downturn in the Southwest Florida real estate market which began at least in May of 2006, if

not before.  Defendant Gulfstream Realty admits in a February 2007 letter to a number of the Plaintiffs and other MU investors that it had in fact observed the downward trend of the market by May of 2006.  Despite this fact/admission, the MU Partners did not disclose the downward trend in the market to the Plaintiffs, but instead represented that the southwest Florida market was continuing to "boom" and continued to induce investing in the MU Properties by the Plaintiffs and other MU students.

110.    The MU Partners did not intend to look out for the best interests of the Plaintiffs.  Instead they intended to look out for their own best interests and to maximize their own profits at the expense of the Plaintiffs.

111.    The MU Partners knew that the representations referenced above were false when they were made.

112.    The MU Partners made the representations referenced above with the intent and for the purpose of inducing the Plaintiffs' reliance.

113.    The Plaintiffs justifiably relied to their detriment on these misrepresentations by entering into contracts to purchase the MU Properties and to finance their purchase of the MU Properties and paying money to one or more of the MU Partners for such purchase and financing.

114.    As a direct and proximate result of the MU Partners' fraud as set forth above the Plaintiffs have been damaged.

115.    The Plaintiffs have demanded rescission of the contracts to purchase, the notes and the mortgages entered into for the purchase and financing of the MU Properties.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against the MU Partners for rescission of the contracts to purchase the MU Properties, the promissory notes and the mortgages entered into for the financing of the MU Properties, rescissionary damages, money damages, punitive damages, costs, interests and all other and further relief that this court deems just.

**COUNT X**
**FRAUD IN THE INDUCMENT**
**CLC AND HURON**

116.    The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61, 63-69, 72-75, 80-82, 87, and 92-94 above.

117.    The representations referenced above were made on behalf of CLC and Huron.

118.    Before CLC entered into promissory note and mortgage transactions with the Plaintiffs and attempted to illegally assign the note to Huron, CLC and Huron knew that the MU Partners made these representations and knew that such representations were false.

119.    CLC and Huron intended that these representations induce the Plaintiffs to enter into promissory notes and mortgage transactions with CLC, which CLC would illegally assign to Huron.

120.    The Plaintiffs justifiably relied upon these representations to their detriment by entering into promissory notes and mortgage transactions with CLC.

121.    As a direct and proximate result of the fraud of CLC and Huron, the Plaintiffs have been damaged.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against CLC and Huron for rescission of the promissory notes and the mortgages entered into for the financing of the MU Properties, rescissionary damages, money damages, punitive damages, costs, interests and all other and further relief that this court deems just.

**COUNT XI**
**FRAUDULENT LIEN**
**GULFSTREAM**

122.     The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61, 63, 67, 69, 77, 97-98, and 102-114.

123.     Gulfstream has filed liens upon the MU Properties and has not released such liens.

124.     The liens filed by Gulfstream against the MU Properties are fraudulent liens filed in violation of §713.31 Florida Statutes in that the Plaintiffs do not owe any money to Gulfstream due to Gulfstream's fraudulent acts and omissions.

125.     Pursuant to §713.31(2)(c) Florida Statutes the Plaintiffs have a right to discharge of the liens and to recover damages from Gulfstream including but not limited to court costs, clerks fees, attorneys fees, and punitive damages.

**WHEREFORE**, the Plaintiffs demand judgment against Gulfstream discharging the liens filed against the MU Properties, and awarding damages and punitive damages to the Plaintiffs, including costs, clerk's fees and attorneys' fees.

### COUNT XII
### CIVIL CONSPIRACY TO DEFRAUD
### MU PARTNERS

126. The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61, 63-70, 77-78, 87, 88, 97-98, 102-114, and 124 above.

127. The MU Partners combined and conspired to create and maintain the MU Program or Enterprise as alleged above for the purpose of committing the frauds alleged above upon the Plaintiffs.

128. Defendants committed one or more acts in furtherance of the conspiracy in Florida by obtaining fraudulent appraisals, by preparing and submitting fraudulent loan documents, by making false representations of material fact to Plaintiffs, and by filing fraudulent liens, all as previously alleged.

129. As a direct and proximate result of the conspiracy and the wrongful actions taken in furtherance of the conspiracy, Plaintiffs have been damaged.

**WHEREFORE**, Plaintiffs demand judgment against the MU Partners, jointly and severally, awarding Plaintiffs money damages, interest and costs of suit.

### COUNT XIII
### FLORIDA RICO CONSPIRACY
### MU PARTNERS

130. The Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1-61, 63-70, 77-78, 87-88, 97-98, 102-114, 124, and 127-129 above.

131. Each of the MU Partners is a "person" as used at §772.103, Florida Statutes.

132. The MU Enterprise is an "enterprise" as defined at §772.102(3), Florida Statutes.

133.    The MU Partners combined and conspired to engage in a pattern of conduct to fraudulently induce Plaintiffs to purchase the MU Properties and to secure their purchase with mortgages against the MU Properties.

134.    The actions of the MU Partners in furtherance of the conspiracy involved distinct and independent criminal acts.  They were neither isolated nor sporadic events, but involved the regular and repeated violation of law to accomplish the MU Partners' desired ends in the course of the continuing business of the racketeering enterprise defined above. The criminal acts were related to each other by virtue of (a) common participants, (b) common victims, (c) common methods of commission, and (d) the common purpose and common result of inducing the Plaintiffs to purchase, mortgage and finance the MU Properties.

135.    In doing so, the MU Partners repeatedly violated the provisions in Chapter 817 and Section 817.034 of the Florida Statutes, and therefore continually engaged in a "pattern of criminal activity" within the meaning of §772.102(4), Florida Statutes.

136.    Moreover, in furtherance of the conspiracy to defraud, one or more of the MU Partners prepared and sent through the United States Mail or via facsimile advertisements or literature or documents to induce the Plaintiffs and others similarly situated to invest in the MU Properties and to finance the investment through the MU Enterprise or its agents.  In sending such materials through the United States Mail or by facsimile in furtherance of the conspiracy, one or more of the MU Partners repeatedly violated 18 U.S.C. §1341 and therefore continually engaged in a "pattern of criminal activity" within the meaning of §772.102(4), Florida Statutes.

137.    The MU Partners therefore unlawfully and willfully combined, conspired, confederated and agreed with each other to violate §817.034, Florida Statutes and 18 U.S.C. §1341, that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of the racketeering enterprise of defrauding the Plaintiffs as described above, all in violation of §772.103(4), Florida Statutes.

WHEREFORE, the Plaintiffs demand judgment against the MU Partners, jointly and severally, for damages, including treble damages, prejudgment interest, costs, attorney's fees and such further relief that is just and appropriate.

**COUNT XIV**
**FEDERAL RICO**
**MU PARTNERS, HURON, CLC**

138.    The Plaintiff's reallege and incorporate by reference the allegations of paragraphs 1-61, 63-70, 72-75, 77, 80-83, 85, 86-88, 92-95, 97-98, 100, 102-114, 117-121, 123-124, 127-129, and 131-137 above.

139.    Each of the MU Partners, CLC, and Huron is a "person" as defined in Title 18 United States Code, section 1961(3).

140.    The MU Enterprise is an "enterprise" as defined in Title 18 United States Code, section 1961(4).

141.    Being employed by or associated with an enterprise engaged in, or the activities of which affected, interstate commerce, the MU Partners, CLC, and Huron participated, directly or indirectly, in the conduct of that enterprise's affairs through a pattern of racketeering activity, to wit; at least two incidents of specified criminal activity in connection with the sale of real property to the Plaintiffs and others as described in.

142.    The actions of the MU Partners, CLC, and Huron involved distinct but interrelated criminal acts. The criminal acts were neither isolated nor sporadic incidents, but were related to each other by virtue of common participants, common victims, common methods of commission, a common purpose and a common result.

143.    The MU Partners, CLC, and/or Huron committed at least two such criminal acts from January 2006 to the date of the filing of this Complaint. The criminal acts included but were not limited to numerous and repeated violations of Title 18 United States Code, section 1341 (mail fraud), and section 1343 (wire and television fraud).

144.    Having devised and intended to devise a scheme to defraud, and for obtaining money by fraudulent pretenses, representations or promises, one or more of the MU Partners, CLC, and/or Huron on more than one occasion from at or around January 2006 up to and including the date of the filing of this Complaint, and for the purpose of executing or attempting to execute that scheme to defraud, did place, or cause to be placed in an authorized depository, a matter or thing to be sent or delivered by the Postal Service or by a private or commercial carrier.  These acts constitute criminal violations of the United States laws prohibiting mail fraud set out in Title 18 United States Code, section 1341.

145.    Having devised and intended to devise a scheme to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, one or more of the MU Partners on more than one occasion from January 2006 up to and including the date of the filing of this Complaint transmitted or caused to be transmitted by Television, communication in interstate commerce, namely: signals, pictures, and sounds with the purpose of executing the scheme to defraud.  These transmissions

occurred regularly in the form of "Infomercials" broadcast in states around the country and were transmitted in violation of the provisions of Title 18 United States Code, section 1343, prohibiting fraud by Television transmission.

146.    Having devised and intended to devise a scheme to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, the MU Partners, CLC and Huron on more than one occasion from at or around January 2006 up to and including the date of the filing of this Complaint, did transmit and cause to be transmitted by wire, communications in interstate commerce. These wire transmissions included writings, signs, signals, pictures, or sounds for the purpose of executing the above referenced scheme to defraud, in violation of Title 18 United States Code, section 1343, which prohibits fraud by wire.

147.    The actions described above constitute an unlawful criminal racketeering activity in violation of Title 18 United States Code, section 1962(c).

148.    The Plaintiffs have been injured in their business and property by reason of CLC, Huron, and the MU Partners' violation of Title 18 United States Code, section 1962(c).

**WHEREFORE**, the Plaintiffs demand judgment against the MU Partners, CLC, and Huron, jointly and severally, for damages, including treble damages, prejudgment interest, costs, attorney's fees and such other relief that is just and appropriate.

## COUNT XV
## FEDERAL RICO CONSPIRACY
## MU PARTNERS, CLC, AND HURON

149.    The Plaintiffs reallege and incorporate the allegations in paragraphs 1-61, 63-70, 72-75, 77, 77, 80-83, 85, 86-88, 92-95, 97-98, 100, 102-114, 117-121, 123-124, 127-129, 131-137, and 139-148 above.

150.    From on or about January, 2006 up to and including the date of the filing of this Complaint, the MU Partners, CLC, and Huron, did combine, conspire, confederate, and agree with each other and with other persons unknown, to violate the provisions of Title 18 United States Code, section 1962(c) as set forth herein; all in violation of Title 18 United States Code, section 1962(d).

151.    The Plaintiffs were injured in their business or property by reason of the CLC, Huron, and the MU Partners' violation of Title 18 United States Code, section 1962(d) as set forth above.

**WHEREFORE**, the Plaintiffs demand judgment against the MU Partners, jointly and severally, for damages, including treble damages, prejudgment interest, costs, attorney's fees, and such other relief that is just and appropriate.

## COUNT XVI
## DECLARATORY JUDGMENT REGARDING CLC ASSIGNMENT OF
## MORTGAGE AND NOTE TO HURON RIVER AREA CREDIT UNION

152.    The Plaintiffs reallege and incorporate the allegations in paragraphs 1-61, 63-69, 72-75, 80-83, 87, 92-94, 100, 117-121, 123-124, 127-129, 131-137, 139-148, and 150-151 above.

153.    This is a cause of action for declaratory judgment pursuant to Title 28, United States Code, Section 2201, for the purpose of determining a question of actual controversy between the parties.

154.    CLC has attempted to assign the construction notes and mortgages for the MU Properties between CLC and the Plaintiffs to Huron River Area Credit Union.  The National Credit Union Administration Board as liquidator of Huron River Area Credit Union has or is attempting to enforce said construction notes and mortgages against the Plaintiffs.

155.    Plaintiffs were never legal members of Huron River Area Credit Union because they are not within the field of membership of Huron River Area Credit Union, their membership applications were fraudulently altered and changed by Huron and/or an agent of Huron, and therefore the assignment of the construction loans and mortgages are void as illegal.

156.    Defendant National Credit Union Administration Board as liquidating agent of Huron River Area Credit Union contends that it has standing to enforce the construction loans and mortgages made by CLC to the Plaintiffs and has sought to enforce said loans and mortgages, despite the admissions made by the NCUA in its Material Loss Review of Huron, attached hereto as Exhibit A.

157.    As alleged above, the Plaintiffs were induced to invest in the turnkey program by material fraudulent representations.  The scope and breadth of this fraudulent enterprise is massive and the illegal funding for these MU Properties and thousands of other investment properties in Southwest Florida was the proximate cause of Huron's failure after the Michigan credit union had been in operation for more than 70 years.  Ultimately, Huron was

liquidated by the Office of Financial and Insurance Regulation in Michigan (Michigan SSA) and the National Credit Union Administration (NCUA), organizations which the NCUA itself found had failed to regulate Huron.

158.    The NCUA has admitted the illegal acts of Huron in the "Material Loss Review of Huron River Area Credit Union, Report #OIG-08-10, dated November 26, 2008" conducted by The National Credit Union Administration's Office of the Inspector General (hereinafter "Material Loss Review").  *See* Exhibit A.  As set forth in detail in the Material Loss Review, the National Credit Union Administration's Office of Inspector General conducted a review of Huron River Area Credit Union as follows:

> We reviewed Huron to:  (1) determine the cause(s) of Huron's failure and the resulting loss to the NCUSIF; and (2) assess NCUA's supervision of the credit union.  See p. 1.  The report notes that the Michigan State Supervisory Authority (SSA) and the NCUA examiners determined, and the Office of Inspector General agrees, that Huron Management:

> - Did not exercise due diligence by evaluating the third party relationship held with its lender, the Construction Loan Company (CLC);

> - Allowed CLC to concentrate a majority of the credit union's loan portfolio in a speculative Florida real estate construction project;

> - Allowed CLC to make construction loans to applicants outside the credit union's approved field of membership;

> - Misclassified construction loans and violated NCUA's Member Business Loan (MBL) limits;

> - Did not have adequate liquidity controls in its ALM Policy; and

> • Failed to develop or follow adequate plans to guide the direction of the credit union and the Florida construction loan program.

*See* Exhibit A, p. 1.

Additionally, the OIG/NCUA determined that Huron management "was not forthcoming with the Michigan SSA and NCUA examiners about the Florida construction loan program" and "may have ignored warnings regarding the expected decline of housing values, in particular those in the Florida real estate market." The OIG/NCUA also "determined [that the] NCUA and [the] Michigan SSA examiners may not have adequately monitored or reacted prudently or timely to trends indicating the safe and sound operation of Huron may have been in jeopardy." *Id.*

The NCUA admits that Huron Management failed to perform due diligence over CLC and the construction loan program. It concluded that Huron management allowed CLC much of the responsibility for making and overseeing Huron's construction loans and that CLC did most of the underwriting. The NCUA and Michigan examiners, once they actually conducted an examination of HRACU, found that "the Huron Board of Directors delegated authority to CLC to originate, underwrite, approve, and perform all servicing and collection functions for the Florida construction and lending program." Huron was found to perform only "minimal up front due diligence while providing virtually no over-sight of the program." *Id.*, at p. 9. The Material Loss Review also admits that as far back as 1999, well before the construction loans and mortgages between CLC and the Plaintiffs were created, the Michigan SSA identified various deficiencies regarding Huron's operations stemming from Huron's lack of due diligence and oversight. *Id.* Moreover, the bank/credit union

examiners noted "deficiencies" with Huron including "lack of [management] oversight, poor loan quality/inadequate loan documentation, concentration risk, and misclassified loans." *Id.*

159.   In the Material Loss Review, the NCUA admits that the subject loans for Florida properties are illegal.   See Exhibit A, at p. 11, 50 ("Florida construction loan applicants were not legal members of Huron.").   The NCUA noted that the Florida loan applicants, like the Plaintiffs, allegedly "joined" the credit union, under the aegis of some entity named Learn & Earn Credit that was also not a legal member of Huron, through the purported purchase of one fully paid share. *Id.*, at p. 11 and at n.26, p. 11.   The Plaintiffs do not know who or what Learn & Earn Credit is and never attempted to join such an organization.   The NCUA readily admits that "[t]hese violations of NCUA bylaws also violated the Michigan Credit Union Act, Section 352 (1)(a), that provides each person belong to a group that is within the credit union's field of membership." *Id.*, at p. 50 at paragraph titled "Illegal Field of Membership (FOM)".

160.   The OIG/NCUA also determined that Huron violated the NCUA's member business loan rules/regulations.   Exhibit A, at p. 11.   Huron further misclassified the nature of the loans being made in Florida, said loans being in an amount over FOUR TIMES the statutory limit. *Id.*   The NCUA also determined that "[b]ased on the timing of Huron management's actions," Huron management withheld from the Michigan and NCUA examiners specific information regarding the Florida construction loan program. *Id.*, at p. 13. On January 31, 2003 Huron management ratified an agreement with CLC to fund $30 million (plus) in Florida construction loans.   Huron management had numerous opportunities to inform the [examiners] of this funding agreement and the extent of the construction loan

program.   However, the [examiners] did not learn of this program until the March 2005 examination." *Id.*  Moreover, the examiners did not learn that the program involved investment properties in Florida until January 2007. *Id.*  Huron management also failed to disclose to the examiners that its construction loan program involved investment properties in Florida, a fact that examiners did not learn until January of 2007. *Id.*

161.   Huron also ignored evidence regarding the expected decline of housing values.  On August 31, 2005, the *Credit Union Times*, a leading weekly publication covering the credit union industry that top credit union executives read for critical news and developments affecting the credit union industry, published an article indicating that Florida home prices in southwest Florida were overvalued by 35 percent. *Id.*, at p. 14. The NCUA also admits in the Material Loss Review that in October of 2005, Huron's Vice President sent an article from the *Credit Union Times* to the President/CEO of Huron which discussed the "unavoidable … housing bust" followed by a weakening US economy.  It is the NCUA/OIG's conclusion/admission, that the articles indicated by mid to late 2005, well before HRACU illegally acquired the subject loans, that Huron knew and was aware of the decline in the housing market and that credit union publications were reporting the declining values of the real estate markets in the Florida communities where Huron and CLC were concentrating their construction loan program.   "Nevertheless, Huron's Florida real estate loan portfolio grew more than 763% between March 31, 2005 and September 30, 2006." *Id.*

162.   In addition to the *Credit Union Times* articles, the NCUA itself also issued a number of letters and alerts to federally insured credit unions like Huron warning about risk-based loans, risk-based lending, due diligence over third party service providers, independent

appraisal evaluation functions for real-estate transactions.  *Id.* at 15.  In 2005, a year before Huron illegally was assigned the subject notes and mortgages, the NCUA issued Risk Alert No. 05-Risk-01:  Specialized Lending Activities – Third Party Subprime Indirect Lending and Participations.  *Id.*  Still, Huron continued to illegally acquire and fund construction loans in Florida for nonmembers in direct contravention of its charter, Michigan, and federal law, and despite the above referenced information.

162.   There is now existing between Plaintiffs and Defendant National Credit Union Administration Board as liquidating agent of Huron River Area Credit Union an actual, justiciable controversy in which Plaintiffs are entitled to have a declaration of their rights, and further relief, regarding the construction loans and mortgages and the NCUA's attempted enforcement of same.  A judicial declaration is necessary and appropriate at this time under all the circumstances

**WHEREFORE**, the Plaintiffs requests that:

1.   The Court enter a declaratory judgment that the assignment of the mortgages and notes for the MU Properties from CLC to Huron River Area Credit Union are illegal and void; and

2.   The Court enter a declaratory judgment that the NCUA in its capacity as liquidating agent for Huron River Area Credit Union has no standing to attempt to enforce the mortgages and notes for the MU Properties between CLC and the Plaintiffs as said notes and mortgages are not assets of Huron River Area Credit Union; and

3.   The Court award plaintiff costs, and grants such other and further relief as may be proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs demand a trial by jury on all claims and issues so triable.


Dated: September 9, 2009

By: */s/ G. Wrede Kirkpatrick* _____
  G. Donovan Conwell, Jr.
  Florida Bar No.: 0371319
  G. Wrede Kirkpatrick
  Florida Bar No.: 984116
  **CONWELL KIRKPATRICK, P.A.**
  2701 North Rocky Point Drive, Suite 1200
  Tampa, FL  33607
  (813) 282-8000; (813) 282-8800 facsimile
  *Attorneys for Plaintiffs*
  dconwell@ckbusinesslaw.com
  wkirkpatrick@ckbusinesslaw.com